ISMAIL J. RAMSEY (CABN 189820)
United States Attorney

MARTHA BOERSCH (CABN 126569)
Chief, Criminal Division

NICHOLAS J. WALSH (CABN 314290)
Assistant United States Attorney

450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495
Telephone: (415) 436-7248
FAX: (415) 436-7234
Email: nicholas.walsh@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>DAVID ALLEN CARRIER,<br><br>Defendant. | Case No. 23-CR-00301 WHA<br><br>UNITED STATES' SENTENCING MEMORANDUM<br><br>Hearing Date: March 26, 2024<br>Time: 2:00 p.m. |

## INTRODUCTION

The United States respectfully submits this sentencing memorandum regarding defendant David Allen Carrier, who, after pleading guilty pursuant to Rule 11(c)(1)(B) of the Federal Rules of Criminal Procedure, is before the Court for sentencing for two violations of 18 U.S.C. § 115(a)(1)(B) – Threats Against a Federal Official. For the reasons set forth below, the United States joins Mr. Carrier in requesting that the Court impose the following sentence: (1) four years of probation, with special conditions as set out in the Plea Agreement Appendix and by the United States Probation Office in the Presentence Investigation Report ("PSR"); and (2) a special assessment of $200.00.

## PROCEDURAL BACKGROUND

On September 12, 2023, the Grand Jury for the Northern District of California indicted Mr. Carrier, charging him with two violations of 18 U.S.C. § 115(a)(1)(B) – Threats Against a Federal Official.

On October 7, 2023, Mr. Carrier was arrested by the Concord Police Department. He came into federal custody on October 10, 2023.

Mr. Carrier pleaded guilty to both counts pursuant to Rule 11(c)(1)(B) of the Federal Rules of Criminal Procedure on December 19, 2023.

Sentencing is set for March 26, 2024, at 2:00 p.m. The United States' Sentencing Memorandum is therefore filed in compliance with Local Rule 32-5(b).

## FACTUAL BACKGROUND

### I. Count One: Mr. Carrier Left a Voicemail Message Threatening United States Congresswoman Nancy Pelosi in January 2021

In January 2021, San Francisco Congresswoman Nancy Pelosi was Speaker of the United States House of Representatives. On Thursday, January 21, 2021, Mr. Carrier left a message on Speaker Pelosi's San Francisco office voicemail. The total length of the recording is 58 seconds, including the systems announcements. The tone of the message – which starts calmly but quickly escalates to angry and yelling – is not fully captured by the following informal transcription:

> Yeah, this is Nancy Pelosi's Office? Bitch, you better resign, you piece of fucking shit, 'cause we got a bullet and a rope with your fucking name on it. We're gonna fucking get you bitch. You're gonna need to work in a fucking slave factory or you're gonna fucking get out of our office. We don't care what the fuck you keep trying to ram down our throats, you old fucking whore. You nasty, diseased-infested bitch. I hope you have to watch your fucking grandkids fucking suffer. Go to hell you cunt.

The message was initially heard by an intern, who perceived it to be a threat and forwarded the message to her bosses. They also perceived the message to be a threat and subsequently forwarded the voicemail to law enforcement for investigation.

Mr. Carrier has admitted that when he made his threat to assault Congresswoman Pelosi, he had the intent to interfere with her while she was engaged in the performance of her official duties as a Member of Congress. As a Member of Congress, Nancy Pelosi was a United States official.

## II. Count Two: Mr. Carrier Left a Voicemail Message Threatening Secretary of the United States Department of Homeland Security Alejandro Mayorkas in June 2022

Seventeen months later, on June 30, 2022, at 12:09 p.m., Mr. Carrier called the United States Department of Homeland Security ("DHS") Office of Inspector General's ("OIG") hotline and asked the operator if it was the line directly to Secretary Alejandro Mayorkas' office. The operator said it was the DHS OIG Hotline, and Mr. Carrier said to relay a message to Secretary Mayorkas: "If he does not close the border someone is going to be shot. And it will be illegal immigrants." Attempts by the operator to get Mr. Carrier's name at that time were unsuccessful. According to the operator, Mr. Carrier said, "Don't worry about who I am, just relay the message."

Later that same day, at about 1:08 p.m., Mr. Carrier left a voicemail message on the United States Department of Homeland Security's general hotline. In that voicemail, Mr. Carrier stated:

> Tell that fuck Mayorkas to close the border before we citizens start killing those fucking illegal immigrants or we come looking for him and feed him to the dogs.

The voicemail message was perceived to be a threat and forwarded to law enforcement for investigation.

Mr. Carrier has admitted that when he made his threat to assault Secretary Mayorkas, he had the intent to interfere with the Secretary while the Secretary was engaged in the performance of his official duties as the Secretary of the Department of Homeland Security. As the Secretary of the Department of Homeland Security, Alejandro Mayorkas was the head of a United States executive department, and thus

a United States official.

**III. Similar Conduct by Mr. Carrier**

As the PSR outlines, Mr. Carrier has occasionally over the past few years called public officials around the country and either made strongly worded political statements to the operators or left similar voicemails. PSR ¶¶ 42, 46, 47. He also had disruptive outbursts at the credit union, PSR ¶ 43, at the supermarket, PSR ¶ 44, and with the local Social Security Administration office, PSR ¶ 45. These incidents are generally in keeping with the nature of the two charged threats, although they do not themselves amount to federal crimes. They also highlight the need for Mr. Carrier to enter treatment, as described below.

**ARGUMENT**

As explained below, the United States joins Mr. Carrier in requesting that the Court impose the following sentence: (1) four years of probation, with special conditions as set out in the Plea Agreement Appendix and by the United States Probation Office in the Presentence Investigation Report ("PSR"); and (2) a special assessment of $200.00.

**I. The Sentencing Guidelines Calculation and Proposed Sentence**

The United States agrees with the criminal history calculations in the PSR, which result in a Criminal History Category of I. PSR ¶¶ 48-57.

The United States and Mr. Carrier agreed to a Total Offense Level calculation of 15 in the Plea Agreement (taking into account Mr. Carrier's acceptance of responsibility). Dkt. 25 ¶ 7.

The Probation Office, in the PSR, calculated a slightly different Total Offense Level because it engaged in the grouping exercise laid out in Section 3D1.4 of the Sentencing Guidelines. PSR ¶¶ 20-41. The grouping exercise adds two points to the offense level calculations in the PSR, resulting in a Total Offense Level of 17 (taking into account Mr. Carrier's acceptance of responsibility). PSR ¶¶ 20-41. The United States acknowledges that the Probation Office's grouping exercise appears to be correct, as the two counts are against separate victims separated by a period of 17 months, and thus should not be grouped together. U.S.S.G. §§ 3D1.1 to 3D1.4.

As calculated by the United States and Mr. Carrier in the Plea Agreement, the Guidelines

imprisonment range for an offense level of 15 and a criminal history category of I is 18 to 24 months. U.S.S.G. Sentencing Table. With the adjustment as calculated by the Probation Office, the Guidelines imprisonment range for an offense level of 17 and a criminal history category of I is 24 to 30 months. PSR ¶ 78; U.S.S.G. Sentencing Table.

The Probation Office recommends a sentence of six months to be followed by three years of supervised release.

The United States and Mr. Carrier recommend a sentence of four years of probation.

## II. The Proposed Sentence is Just and Meet

The United States avers that a sentence of four years of probation is appropriate and just because it takes into account the various considerations set out in Section 3553(a) of Title 18 of the United States Code.

### A. Supervision by an Empowered Probation Officer is the Best Way to Protect the Public by Preventing Mr. Carrier from Committing New Offenses

Of the various important concerns and considerations enumerated in Section 3553(a), in this case, the United States is most focused on "protect[ing] the public from further crimes of the defendant…" 18 U.S.C. § 3553(a)(2)(C). Thus, the primary concern of the United States is stopping Mr. Carrier from continuing to threaten public officials in the future. Threatening public officials has a corrosive effect on the country's democracy, in that it deters individuals from pursuing public office and it makes for a difficult and hostile working environment for public officials and their staff, who have to deal with animated statements that may or may not amount to criminal threats on a regular basis. Mr. Carrier's threats in this case are reprehensible and deserving of punishment.

At the same time, the United States is conscious of the right of citizens in our country's democracy to express their approval or disapproval to elected officials. Reaching out to elected officials is in the heartland of protected speech under the First Amendment to the United States Constitution. Nonetheless, the Supreme Court has made clear that, "True threats of violence are outside the bounds of First Amendment protection and punishable as crimes." *Counterman v. Colorado*, 600 U.S. 66, 143 S. Ct. 2106 (June 27, 2023). Thus, even if a speaker also wishes to communicate some other idea or address a matter of public concern – speech "entitled to special protection," *Snyder v. Phelps*, 562 U.S.

443, 452 (2011) (quotation marks omitted) – any attendant threats of violence remain proscribable. *See McCalden v. Cal. Library Ass'n*, 955 F.2d 1214, 1222 (9th Cir. 1990) ("That appellees were engaging in protected expressive activities at the same time and to the same end as the alleged threats of violence does not immunize appellees from liability for the alleged threats…. Nor does the fact that appellees were politically motivated immunize them from liability if they in fact engaged in threats of violence."); *United States v. Kelner*, 534 F.2d 1020, 1027 (2d Cir. 1976) ("Even where the threat is made in the midst of what may be other protected political expression, . . . the threat itself may affront such important social interests that it is punishable . . . ."); *see also United States v. Waggy*, 936 F.3d 1014, 1019 (9th Cir. 2019) ("That Defendant included some criticism of the government does not necessarily imbue his conduct with First Amendment protection.").

As laid out in the PSR, over the past few years, Mr. Carrier has reached out to public officials around the country to express his strongly held political positions, often in anger, and often using language that calmer minds might conclude is counterproductive. The United States reviewed these various situations and determined that in most instances, Mr. Carrier did not commit a federal crime, even though his choice of language and the venomous tone with which he expressed his opinions were repugnant. The United States did, however, charge the two instances where it was clear that Mr. Carrier's language crossed the line from odious to criminal, and those are represented in this criminal case.

Presented with a situation in which it must balance respecting Mr. Carrier's First Amendment rights and sanctioning Mr. Carrier's criminal threats that are not protected by the First Amendment, the United States has turned to the causes of Mr. Carrier's behavior for guidance. In the view of the United States, Mr. Carrier's outbursts in this case are driven by some combination of mental health issues, substance abuse, and economic and social isolation. All of these causes are best addressed by an attentive probation officer empowered to force Mr. Carrier to attend mental health counseling, go to substance abuse treatment, obtain employment, and widen his social circle. *See* 18 U.S.C. § 3553(a)(2)(D) (stating that a criminal sentence should "provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner"). Thus, no matter what sentence the Court ultimately decides to impose, Mr. Carrier's sentence should

include conditions of probation or supervised release directly targeting the causes of Mr. Carrier's criminal behavior. Mr. Carrier will learn the self-control to stop his behavior only by directly addressing its causes. In the view of the United States, the answer is close supervision by the Probation Office.

**B. In the Circumstances of this Case, Incarceration is Not Necessary and Will be Counterproductive**

As the Court is well aware, another factor set out in Section 3553(a) is the need for the sentence imposed to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense…." 18 U.S.C. § 3553(a)(2)(A). Arguably, as the Probation Office concluded, a term of imprisonment would accomplish those goals, and the United States routinely argues for incarceration in other cases based precisely on that provision. In this case, however, it is the judgment of the United States that incarceration is not necessary and would be counterproductive, as explained below.

Foremost, as noted above, the United States is focused on preventing future crimes by Mr. Carrier through the work of an active and empowered probation officer. The maximum amount of time allowable by statute for supervised release under the charged statute is three years. Accordingly, the United States recommends four years of probation, lengthening his supervision by an entire year over what is possible under supervised release. That gives the Probation Office an entire additional year of supervision of Mr. Carrier, during which time he will be forced to participate in mental health and substance abuse counseling. Mr. Carrier's mental health and substance abuse are two core causes of his criminal behavior. A longer period of supervision in the judgment of the United States is a significant benefit over a period of incarceration followed by a shorter term of supervised release. Thus, the Probation Office's proposal of six months incarceration to be followed by three years of supervised release would have Mr. Carrier outside of supervision quicker than what the United States proposes to the Court.

Second, probation acts as a greater inducement for compliance compared to supervised release. As the Court knows, sentences for violations of supervised release for a Class C Felony is limited to two years of incarceration, and the guidelines for such violations are often much shorter. *See* 18 U.S.C. § 3583(e)(3). In contrast, punishment for a violation of probation is simply resentencing, and thus a

punishment of up to 10 years could be meted out to Mr. Carrier. *See* 18 U.S.C. § 3565. Mr. Carrier's guideline sentencing range is at 24 to 30 months. If Mr. Carrier were to violate the terms of his probation, as the United States recommends, the Court could then impose a lengthier sentence on Mr. Carrier than it could were he to be on supervised release. Mr. Carrier has been advised of this possibility by his attorney, and the greater potential penalty for violating the terms of his probation (as compared to supervised release) will therefore act as a greater deterrent. And deterring Mr. Carrier from committing future similar crimes is a primary goal from the perspective of the United States.

Third, the United States asserts that two of the causes of Mr. Carrier's threats were economic and social isolation. Since Mr. Carrier has been charged in this case, the Pretrial Services Office has undertaken many efforts get Mr. Carrier working and transplant Mr. Carrier into a broader social environment. To the best of the United States' understanding, Mr. Carrier spent much of the last few years living at his significant other's house, unemployed, with occasional spot work as a barber. Since charging, Mr. Carrier has obtained employment at Urban Alchemy cleaning and monitoring the streets of the Tenderloin and, it appears, more recently as a maintenance technician with Preferred Solutions Corporation. He has also – required by virtue of a restraining order – moved out of his significant other's house in East Bay and has obtained housing on his own in San Francisco, which he is paying for through his employment. These are positive changes that may well reorient Mr. Carrier away from his prior situation, both in terms of employment and living arrangements, that led to his criminal behavior. As a result, sending Mr. Carrier to prison will simply disrupt this progress and leave him more likely to recidivate on his release.

Finally, Mr. Carrier did not contest his guilt and quickly pleaded guilty; he therefore deserves credit for the speedy resolution of this matter. Mr. Carrier appears to acknowledge his lapse of judgment in making threats to the victims in this case, and his willingness to avoid lengthy litigation should not be overlooked. Thus, in the judgment of the Unite States, a more severe punishment in the form of a period of incarceration is not warranted.

In the end, it is the position of the United States that the proposed sentence of four years of probation is sufficient, but not greater than necessary, to comply with the purposes of sentencing. *See* 18 U.S.C. § 3553(a).

**CONCLUSION**

For the reasons set forth above, the United States joins Mr. Carrier in respectfully requesting that the Court sentence Mr. Carrier to: (1) four years of probation, with special conditions as set out in the Plea Agreement Appendix and by the United States Probation Office in the PSR; and (2) a special assessment of $200.00.

DATED: March 19, 2024

Respectfully submitted,

ISMAIL J. RAMSEY
United States Attorney

*/s/ Nicholas Walsh*
NICHOLAS J. WALSH
Assistant United States Attorney